358

GREAT NORTHERN RY. CO. v. RY-
KRISP CO.

No. 2197.

District Court, D. Minnesota, Fourth Division.
July 24, 1933.

J. H. Mulally and R. J. Hagman, both of St. Paul, Minn., for plaintiff.

Cobb, Hoke, Benson, Krause & Faegre, of Minneapolis, Minn., and C. R. Hillyer, of Chicago, Ill., for defendant.

NORDBYE, District Judge.

The plaintiff brings this action to recover judgment in the sum of $8,868, which sum represents a balance of freight charges claimed to be due under its tariffs for the transportation of numerous shipments of a product sold under the trade-name of "Ry-Krisp." Defendant paid plaintiff the charges fixed by the tariff for the transportation of "cooked cereal food preparations," and the amount claimed here is the difference between the tariff rate for the transportation of "bakery goods" and the tariff rate for the transportation of "cooked cereal food preparations." Defendant filed a counterclaim to recover from plaintiff the sum of $24,636.27, alleged overcharges on shipments of Ry-Krisp made by it during the period from May 15, 1928, to October 14, 1930. The amount of the counterclaim represents the difference between the bakery goods rates collected by the plaintiff, and the cooked cereal food preparations rates which defendant contends were applicable. The tariff in effect during the period covered by the counterclaim reads the same as the tariff in effect during the period covered by plaintiff's claim. There is no dispute between the parties as to the amounts that are due the plaintiff and defendant depending upon which tariff classification is applicable. That is, if Ry-Krisp should be classified under the tariff as bakery goods, plaintiff should be given judgment for the amount sued for and the counterclaim should be dismissed. If Ry-Krisp should be classified as a cooked cereal food preparation under the tariff, then plaintiff's complaint should be dismissed and defendant should have judgment on its counterclaim, unless the determination of the question herein by the Interstate Commerce Commission, hereinafter referred to, is determinative of the issues herein.

The Ry-Krisp Company, a Minnesota corporation, was dissolved in 1928, and the Ralston Purina Company is a Missouri corporation, the successor to the property of the Ry-Krisp Company. Some of the shipments involved herein were made by the Ry-Krisp Company, and the balance by the Ralston Purina Company. By stipulation between the parties, it was agreed that the Ralston Purina Company may be substituted for the Ry-Krisp Company herein, and that the Ralston Purina Company should be liable for and agreed to pay any amount due from the Ry-Krisp Company to this plaintiff, together with interest and taxable costs to the same extent as the Ry-Krisp Company would be liable for if it had remained as a party of record. On July 22, 1931, the court entered an order, based on the stipulation, substituting the Ralston Purina Company for the Ry-Krisp Company in this action. Therefore, in the determination of the issues, it becomes unnecessary to distinguish between the shipments made by the Ry-Krisp Company and

those made by the Ralston Purina Company. Transactions of either company will be referred to herein as transactions of the defendant.

During the entire period with which we are concerned, the classification description provided by said tariffs of commodities taking the bakery goods rate is as follows:

"Bakery Goods: Biscuits, Bread, Cakes, Crackers, Matzos, Pretzels or Toast, N.O.I.B.N."

And the classification description provided by said tariffs of commodities taking the cooked cereal food preparations rates is as follows:

"Food Preparations: Cereal, Cooked (prepared cereals ready for human consumption without further cooking); * * * Flaked or shredded, N.O.I.B.N. Compressed in flat forms or compressed and then crumbled."

There are, therefore, only two questions before the court: (1) Is the decision of the Interstate Commerce Commission of May 8, 1930, determinative of the tariff classification of Ry-Krisp, and binding upon this court? (2) If this court has jurisdiction to determine the tariff classification, regardless of the decision of the Interstate Commerce Commission, should Ry-Krisp be classified as bakery goods or as cooked cereal food preparations, as these terms are used and defined in the tariff?

Ry-Krisp is made by taking the whole rye berry and compressing it into a flat form. Salt and water are added, and that mixture is again compressed into a flat form, from which rectangular pieces are cut approximately 3" by 2" and placed in an oven until the forms will remain intact. Then the product is subjected to a second baking or cooking process, principally for the purpose of sterilization. Defendant contends that its product is cooked as distinguished from baked, and seeks, therefore, to distinguish this product from bread, crackers, etc., which are unquestionably made by a baking process. It appears that Ry-Krisp is placed in ovens and dry heat applied, and that the only practical difference between the preparation of this product and baked goods is the temperature of the oven and the fact that Ry-Krisp, when placed in the oven, has a large content of water. The moisture emanating therefrom and the steam resulting may have some cooking effect on the product in the oven as distinguished from baking. The finished product is packed in packages similar to those used in the breakfast food trade, and the container in which the product is packed and sold by the defendant has printed thereon the following descriptive statements:

"Delikatess Brod

(Scandinavian Health Bread)

"Ralston Ry-Krisp—The Whole Rye Wafer."

"THE ALL PURPOSE WHOLE RYE WAFER

"For Breakfast * * * Serve as toast. For Lunch as crackers with soups and salads. * * * For Dinner * * * with every course. * * * Delightful and Nutritious between Meals and at Bedtime."

Defendant contends that the inherent characteristics of its product unmistakably mark it as a flaked cereal compressed in flat form, and it therefore cannot be classified as bakery goods. It cites a definition of "bread" once promulgated by the Secretary of Agriculture for the guidance of officials of that Department in enforcing the Food and Drugs Act of 1906. This definition is substantially as follows: "Bread is made by baking a dough consisting of a leavened or unleavened and kneaded mixture of flour, water, edible fat, sugar, and other fermentable carbohydrate substances, salt and yeast."

"Biscuit," according to the defendant, is a small loaf or cake of bread raised and shortened or made light with soda or baking powder. "Cake" is a sweetened composition of flour, eggs, butter, sugar, and other ingredients, leavened or unleavened, baked in a loaf or mass of any size or shape, usually sold in bakery shops fresh to avoid perishability. "Cracker" is a thin, brittle biscuit, such as an oyster cracker. "Matzos" is an unleavened bread eaten by the Jewish people during the Passover season, and is generally made from flour and water. "Pretzels" are made from flour and contain fat and leaveners. "Toast" is a sliced bread, dried and browned before or over a fire.

Defendant cites these various definitions of the articles particularly referred to under the bakery goods classification in order to emphasize the difference between Ry-Krisp and the products enumerated therein. That is, defendant contends that bakery goods are made from flour and are baked, and contain a leavening agent and fats, while Ry-Krisp is made by the blending of the whole flaked rye berry with salt and water and subjected to oven heat, which, due to the water in the product, results in a moist heat, and that therefore Ry-Krisp is subjected to a moist heat as distinguished from a dry heat. The

·flaking of the rye berry is produced by rolling the grain, as distinguished from grinding the grain, and after flaking, the front portion of the berry is embodied in the center part of the grain, and either way it is turned, one can still make out the form of the rye berry. ·

Now, then, it appears that on May 21, 1928, the Ralston Purina Company and the Ry-Krisp Company filed a complaint with the Interstate Commerce Commission against numerous carriers, including this plaintiff, alleging that the rates provided by the tariffs on Ry-Krisp were: (1) Unjust and unreasonable in violation of section 1 of the Interstate Commerce Act (49 USCA § 1); (2) unduly prejudicial and unjustly discriminatory in violation of section 3 of the Interstate Commerce Act (49 USCA § 3); and (3) that on shipments of Ry-Krisp made by complainants, the defendants assessed transportation charges provided by the tariffs for bakery ·goods, and "that the collection of said rates and charges upon Ry-Krisp in excess of the rates and charges applicable on cereal food preparations above described, has resulted in payment by complainants of unlawful charges in excess of the published tariff, and in violation of section 6 of the Interstate ·Commerce Act [49 USCA § 6]."

In the prayer of the complaint, the complainants requested an order from the commission requiring the defendants to pay, by way of reparation, such sum as the commission should determine that complainants are entitled to as an award of damages on all shipments moving after May 1, 1925, and throughout the pendency of the proceedings before the commission. Section 6 (7) of the Interstate Commerce Act, referred to above (49 USCA § 6 (7), provides among other things that no carrier shall "charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time. * * *"

The tariff classifications considered by the commission at the hearing on defendant's complaint were the same as before this court, and the commission was asked among other things to decide the identical question that is now being submitted to the court. Testimony was given before the commission by the shipper and the carriers, and expert testimony was submitted by both sides with reference to the tariff classification applicable to a product such as Ry-Krisp. The matter was submitted on December 13, 1929, and on May 8, 1930, the matter was determined by the commission. On page 434 of the commission's report is found the following:

"Although the reasonableness of the rates and ratings are assailed, complainants' evidence is directed principally to the issue under · der Section 6.

"The first question for determination is whether the rates and ratings on cooked cereal-food preparations flaked or shredded, or the rates and ratings on bakery goods, are applicable on complainants' product. Ry-Krisp is made of flaked whole rye, mixed with water and salt only. The mixture is rolled or compressed into thin sheets from which disks 11 inches in diameter with a hole in the center, or rectangular forms about 3 by 4 inches are cut. To prevent the sheets from sticking to the cutting machine, the mixture is dusted with the so-called rye flour obtained when the rye is flaked. The forms are placed in what complainants term a preliminary dryer, but which defendants contend is an oven, and subjected to high temperature until the moisture added in the mixing operation is eliminated. While within the dryer or oven, usually about 15 minutes, the forms revolve, passing repeatedly through temperatures of 100 degrees to 500 degrees Fahrenheit. Following this process the forms are placed in a final drying chamber or kiln for a period ranging from 1 hour 10 minutes to 1 hour 40 minutes until their moisture content is reduced below that of the grain from which they are made. The temperature in the final dryer is not stated. The product, varying in thickness from an eighth to a quarter of an inch, is then ready for packing. Ry-Krisp in granular form, obtained by crumbling or grinding the product in the forms described, is recognized as a cereal food preparation, and the ratings thereon are not in issue. Ry-Krisp is packed for distribution in cartons, which are placed in boxes for shipment. Claims thereon for loss or damage are negligible. ·

"Complainants contend, and introduced evidence designed to prove, that Ry-Krisp is not a bread, biscuit, cracker, or pretzel; that it bears no resemblance to matzos; and that it is not included in any of the classification descriptions of bakery goods. The food and drugs act of 1906 states that 'Bread is made by baking a dough consisting of a leavened or unleavened and kneaded mixture of flour, water, edible fat, sugar and other fermentable carbohydrate substances, salt and yeast.'

Complainants point out that Ry-Krisp is not made from a kneaded dough; that it contains no flour, fat, sugar, other fermentable carbohydrate substances, or leavening agent, such as yeast or baking powder, and that fermentation or 'proofing' has no place in the manufacturing process. Since it is not leavened with yeast, it can not be imported as bread free of duty under the Tariff Act of 1922. Complainants state that it would be in violation of the food and drugs act to represent and sell Ry-Krisp as bread, and this would perhaps follow from the evidence just reviewed, but complainants' further statement that it would likewise be unlawful under that statute to sell Ry-Krisp as a biscuit or cracker is unsupported by the record.

"Ry-Krisp is described on its container as 'the entire rye wafer.' It is sold to the ultimate consumer by grocery stores and delicatessen stores, but not, as complainants point out, by bakeries. Bakery goods are of course sold at grocery and delicatessen stores, and the fact that local bakeries do not handle Ry-Krisp is hardly significant, since it is made only by complainants at Minneapolis. In the printed matter on the container it is suggested that Ry-Krisp be eaten buttered and warmed for breakfast, that it be tasted with jam or cheese, or broken into a bowl of milk, and that it be used for lunches and camping. These suggested uses indicate that Ry-Krisp is not essentially a cereal breakfast food. Defendants introduced in evidence advertising matter representing Ry-Krisp as health bread and describing it as a 'whole-grain bread.' The printed matter on the package describes it as 'crisply cooked whole rye wafers.' Ry-Krisp is listed on the menu cards of a large hotel, a chain of restaurants, and the dining-car service of one of the defendants under the heading of rolls, toast, and breads, and not under the heading provided for breakfast foods. In support of their contention that Ry-Krisp is baked, defendants stress the fact that it is subjected to temperatures as high, and for as long a period, as are required for baking cookies and other thin bakery products.

"Prior to 1926, when the Ralston Purina Company purchased the Ry-Krisp Company, the latter in its advertising described Ry-Krisp as an unleavened bread made of selected rye, cleaned, ground, aerated, and baked in a modern sanitary factory. The application made in 1905 for registration of the trade-mark described the product upon which the term was applied as crackers or biscuits. Defendants introduced in evidence samples of various imported and domestic hard breads and crackers which take the bakery-goods ratings and are comparable with Ry-Krisp from the standpoints of their principal ingredients, manufacturing processes, and general transportation characteristics. That the principal competition encountered by Ry-Krisp is with articles of this nature, which are recognized commercially as bakery goods, rather than with cereal food preparations represented and used primarily as breakfast foods, is a reasonable conclusion from the evidence.

"Ry-Krisp is represented and sold to the public as a rye wafer, or cracker. The uses and purposes which it has been advertised for more than a quarter of a century to serve, and which it does serve, indicate that it is properly to be considered bread or a substitute for bread. While Ry-Krisp is no longer referred to in the advertising as bread, the mere change of designation in the advertising did not change the inherent nature or character of the commodity itself.

"When the Ralston Purina Company acquired control of the Ry-Krisp Company in June, 1926, the practice of billing Ry-Krisp as bakery goods was discontinued, and it was thereafter billed for shipment as a cereal food preparation. As cereal food preparations compressed in flat forms are rated lower than bakery goods this change in billing resulted in lower charges being collected on the shipments. The propriety of this billing is disputed by defendants, and pending court action to collect alleged undercharges has been deferred awaiting our findings in this case.

"Complainants do not question the lawfulness of the bakery goods rates and ratings as such, but complain of them only as they are applied on Ry-Krisp. * * *

"We find that the ratings and rates on bakery goods were and are applicable on Ry-Krisp from and to the points considered, and that the applicable ratings and rates on Ry-Krisp were and are not unreasonable or unduly prejudicial. The complaint will be dismissed."

On October 7, 1930, the entire commission entered an order denying the petition of complainants therein for reconsideration and reargument. The question as to whether the commission's determination is binding upon this court is dependent upon the nature of this controversy. If the construction of the classification description provided by the tariff is a mere matter of law, then it is for the court and not for any administrative body to determine. Construction of language

used in a general and ordinary manner in a tariff provision is as amenable to the court's interpretation as the terms of any contract or writing. No different rule prevails, and if the allocation of Ry-Krisp to the bakery goods or cereal food preparations classification is merely the construction of the words and phrases used in the general, ordinary, and usual manner, then the determination of the commission is not determinative or binding upon this court, though it may be persuasive. But if the tariff provisions contain words used in a peculiar and special meaning, and extrinsic evidence to determine this meaning is necessary, or if the manner in which the terms are used is itself a question of fact, a preliminary determination by the commission will be necessary before the court may assume jurisdiction. Apparently, the whole purpose is to obtain uniformity and to leave to the commission the questions of fact so that that body, composed of specialists, will be able to determine such questions, and provide thereby a ruling regarding tariff construction that will be consistent and uniform throughout the land.

The case of Texas & Pacific Railway Co. v. American Tie & Timber Co., 234 U. S. 138, 34 S. Ct. 885, 58 L. Ed. 1255, involved an action by plaintiff against the railway company to recover damages which it contended it sustained on account of the railway company's refusal to furnish cars for the loading of certain oak railway cross-ties. When the plaintiff proffered the ties for shipment, the railway company refused the shipment because it contended that it had no tariff on file naming rates for transportation of oak railway cross-ties, and that it therefore would be unlawful to accept the ties for shipment. Plaintiff contended that oak railway crossties were included in a tariff filed by the railway company naming rates on "lumber, all kinds (except walnut and cherry), lath and shingles and articles taking same rates," and therefore the railway company should have furnished the cars. The question, therefore, was whether or not oak railway crossties were included in the tariff description of oak lumber. On page 146 of 234 U. S., 34 S. Ct. 885, 888, 58 L. Ed. 1255, the court stated:

"It is not disputable that the pivotal question in the case was whether oak railway cross-ties were included in the filed tariff fixing a through lumber rate of 24 cents per hundredweight, and so far as the solution of that inquiry depended upon the views of men engaged in the lumber and railroad business, as developed in the testimony, it is equally indisputable that there was an irreconcil-

able conflict. And this conflict at once leads to a consideration of the principle which dominates the controversy, and upon which its decision, therefore, depends.

"There is no room for controversy that the law required a tariff, and therefore, if there was no tariff on cross-ties, the making and filing of such tariff conformably to the statute was essential. And it is equally clear that the controversy as to whether the lumber tariff included cross-ties was one primarily to be determined by the Commission in the exercise of its power concerning tariffs and the authority to regulate conferred upon it by the statute. Indeed, we think it is indisputable that that subject is directly controlled by the authorities which establish that, for the preservation of the uniformity which it was the purpose of the act to regulate commerce to secure, the courts may not, as an original question, exert authority over subjects which primarily come with the jurisdiction of the Commission."

The Supreme Court held that the lower court should have dismissed that action because the question involved must first be determined by the Interstate Commerce Commission, and therefore that the lower court had no jurisdiction.

In G. N. Railway Co. v. Merchants' Elevator Co., 259 U. S. 285, 42 S. Ct. 477, 478, 66 L. Ed. 943, decided in 1922, the elevator company brought an action against the railway company to recover an overcharge. Apparently, the only question involved was whether the railway company was authorized by the language of the tariff to collect a reconsignment charge on grain shipped by the elevator company. The court stated: "Whether the charge was payable depended solely upon a question of construction; that is, whether the body of the rule or the exception to it applied," and that "there was no dispute concerning the facts." While the court in the Merchants' Elevator Company Case determined that the words of that tariff were used in the ordinary sense, and all that was necessary was to apply the meaning of such words to the undisputed facts, and that therefore reference to the commission was unnecessary, it clearly annunciated the circumstances under which the construction of the tariff is exclusively for the commission, and when it is a matter for the courts to decide. On page 291 of 259 U. S., 42 S. Ct. 477, 479, 66 L. Ed. 943, the court stated:

"But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character

from those presented when the construction of any other document is in dispute.

"When the words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law. But words are used sometimes in a peculiar meaning. Then extrinsic evidence may be necessary to determine the meaning of words appearing in the document. This is true where technical words or phrases not commonly understood are employed, or extrinsic evidence may be necessary to establish a usage of trade or locality which attaches provisions not expressed in the language of the instrument. Where such a situation arises, and the peculiar meaning of words, or the existence of a usage, is proved by evidence, the function of construction is necessarily preceded by the determination of the matter of fact. Where the controversy over the writing arises in a case which is being tried before a jury, the decision of the question of fact is left to the jury, with instructions from the court as to how the document shall be construed, if the jury finds that the alleged peculiar meaning or usage is established. But where the document to be construed is a tariff of an interstate carrier, and before it can be construed it is necessary to determine upon evidence the peculiar meaning of words or the existence of incidents alleged to be attached by usage to the transaction, the preliminary determination must be made by the Commission; and not until this determination has been made, can a court take jurisdiction of the controversy. If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not be attained. For the effect to be given the tariff might depend, not upon construction of the language—a question of law—but upon whether or not a particular judge or jury had found, as a fact, that the words of the document were used in the peculiar sense attributed to them or that a particular usage existed.

"It may happen that there is a dispute concerning the meaning of a tariff which does not involve, properly speaking, any question of construction. The dispute may be merely whether words in the tariff were used in their ordinary meaning, or in a peculiar meaning. This was the situation in the American Tie & Timber Co. Case, supra. The legal issue was whether the carrier did or did not have in effect a rate covering oak ties. The only matter really in issue was whether the word 'lumber' which was in the tariff, had been used in a peculiar sense. The trial judge charged the jury: 'If you believe from the evidence that oak railway cross-ties are lumber within the meaning and usage of the lumber and railroad business, then you are charged the defendant had in effect a rate applying on the ties offered for shipment.' This question was obviously not one of construction; and there is not to be found in the opinion of this court, or in the proceedings in either of the lower courts, a suggestion that the case involved any disputed question of construction. The only real question in the case was one of fact; and upon this question of fact 'the views of men engaged in the lumber and railroad business, as developed in the testimony' were in 'irreconcilable conflict.' 234 U. S. 146, 34 S. Ct. 885, 888, 58 L. Ed. 1255. As that question, unlike one of construction, could not be settled ultimately by this court, preliminary resort to the Commission was necessary to insure uniformity."

On page 294 of 259 U. S., 42 S. Ct. 477, 480, 66 L. Ed. 943, the court said further: "In the case at bar the situation is entirely different from that presented in the American Tie & Timber Co. Case, or in the Loomis Case [240 U. S. 43, 36 S. Ct. 228, 60 L. Ed. 517]. Here no fact, evidential or ultimate, is in controversy, and there is no occasion for the exercise of administrative discretion. The task to be performed is to determine the meaning of words of the tariff which were used in their ordinary sense and to apply that meaning to the undisputed facts. That operation was solely one of construction; and preliminary resort to the Commission was, therefore, unnecessary."

The record before the commission in the instant case is in evidence, not as evidence of any fact contained therein, but merely as indicative of the conflict and difference of opinion among rate experts and others as to the tariff classification to which Ry-Krisp properly belongs. In fact, a simple recital of the position taken by plaintiff is indicative of the question of fact that necessarily must be presented to any tribunal before it could determine the question involved. Plaintiff's witnesses before the commission and the evidence before this court went into considerable detail in explaining the methods of manufacture, the ingredients, the basic difference between Ry-Krisp and bakery products, and the types of competitive cereal products that obtained the cooked cereal food preparations tariff.

Ry-Krisp is a trade-marked product, and from its name and observation of the product, it would be quite impossible to determine its ingredients, its methods of manufacture, or

its inherent characteristics. It appears that, originally, products at least similar to Ry-Krisp were used by the Scandinavians as a substitute for bread. The product gained vogue in this country as a health bread or health food, and was often referred to as "Swedish Health Bread." Defendant itself on its carton refers to the product as Scandinavian bread. Now, defendant before the commission, and also before this court, contends that this product is not comparable to bread, crackers, or Matzos, which are products of a bakery, and by expert testimony seeks to establish that its product is cooked instead of baked, and by introduction of technical testimony seeks to distinguish its article from those that are included in the bakery goods classification. It is a well-known fact that cereal food preparations are not subject to any exact definition or interpretation, and cereal, generally speaking, is any food-stuff made from grain; but in recent years, since the advent of the so-called dry breakfast foods, it is common knowledge that cereal in a limited sense refers to breakfast food, either hot or cold. If one went into a restaurant and asked for the kind of cereals served, the waiter would undoubtedly mention the usual breakfast foods that are on the menu. Now, does the term in the tariff, "Cooked Cereal Food Preparations compressed in flat forms," refer solely to breakfast foods, or does it refer to any cooked cereal food preparation that may be compressed in a flat form, as certain types of crackers or biscuits? If it is general and all-inclusive in its terms, it may well be that Ry-Krisp fairly comes within that tariff classification. But reasonable minds may differ as to the terms being used in a general or peculiar sense, and all of the facts and circumstances present a situation that strikingly indicates the desirability of having this question determined by a tribunal that sits as judges of the facts, so that all testimony with respect to the usages and customs of the trade, the number of similar articles on the market, the competition that it is subjected to, and the types of similar products in the food market field, may be presented and duly considered in determining the question involved. In no other way can uniformity be obtained, and needless to say, the Interstate Commerce Commission, with its experts in rate matters and its knowledge of the basic reasons for the differentiation in tariff classification, should be far better equipped to determine this question than the various courts throughout the country. At any event, it must be apparent that the mat-

ter presented is not a question of law for the court. Before the commission, many products made solely of rye, some with yeast and some without, were introduced in evidence as being available in the various food markets. These products were very similar to defendant's Ry-Krisp. Some were imported from Sweden and others were domestic. The commission may well have concluded that these various rye health breads were the actual competitors of Ry-Krisp, rather than the breakfast food products. Experts before the commission gave their reasons as to why Ry-Krisp should be classified as a cereal food preparation. Others were just as earnest and sincere in contending that this product was properly classified as a rye cracker, or rye wafer, and consequently was properly allocated to the bakery goods classification. As illustrative of the difference of opinion that exists among persons engaged in different businesses regarding the classification of Ry-Krisp, the only witness produced by the defendant at this trial before the court testified in cross-examination as follows:

"Q. I take it then, from what you say, the term crackers, bread and toast might mean one thing to you as a chemist or manufacturer and might mean something else to your advertising department? A. Exactly.

"Q. And may mean something else to the traffic department or to a railroad man who is shipping that product? A. Yes, that is true.

"Q. So you have words on that Exhibit there (package of Ry-Krisp) that different people interpret differently, depending upon what line of business they are in? A. Yes sir. * * *"

The difference between baking and cooking, between flaking, as contradistinguished to the grinding of flour, the purpose of proofing (maintaining the product at a temperature favorable to yeast), the effect of intensive heat in baking, and the effect of yeast upon the product—all enter into the technical picture to substantiate defendant's position that its product is not bakery goods, and strikingly serve to illustrate the scientific field that must be entered into in order to determine the question presented. The report of the commission indicates that the testimony was in conflict, and on page 436 of its report, it appears that the commission found as a fact: "That the principal competition encountered by Ry-Krisp is with articles of this nature, which are recognized commercially as bakery goods, rather than with cereal food

preparations represented and used primarily as breakfast foods, is a reasonable conclusion from the evidence."

Manifestly, therefore, if effect is to be given to the rules as annunciated by the court in the American Tie & Timber Co. Case, the Merchants' Elevator Co. Case, Standard Oil Co. v. U. S., 283 U. S. 235, 51 S. Ct. 429, 75 L. Ed. 999, and Davis v. Age-Herald Pub. Co., 293 F. 591 (C. C. A. 5), then this court must conclude that the question presented is one peculiarly for the commission to determine preliminarily before this court could assume jurisdiction. The commission having determined as a question of fact from the evidence presented to it, that Ry-Krisp should be classified as bakery goods for rate purposes, the court adopts such determination, and the parties having stipulated as to all other facts, it necessarily follows that plaintiff is entitled to the relief it seeks and that the counterclaim must be dismissed.

If it should be assumed that, notwithstanding the nature of the question presented and the determination of the commission thereof, the court has jurisdiction, then, upon the evidence presented at this trial, the court would and does find as a fact that Ry-Krisp should be classified as bakery goods for rate purposes. Obviously, however, the determination of such a question would be one of fact, and the court is prompted to such conclusion because it is the court's view that the terms used in the tariff are used in a peculiar and limited sense, rather than in the ordinary and customary one. Ry-Krisp is not sold as a cereal or as a breakfast food; it is sold and held out to the public as a rye wafer or cracker. True, it may have many other uses, but primarily it is an unleavened bread. The pictures on the carton in which it is packed, and the descriptive statements thereon, indicate its use as a rye wafer or cracker. In the community where the product was originated, and where it is in general use, it is common knowledge that it is generally known and considered as a substitute for bread. Now, of course, the use of a product is not necessarily controlling, and it may under some circumstances be entirely disregarded, but defendant's own descriptive terms and statements certainly have some bearing upon the proper tariff classification.

In that the court has adopted the findings of the commission with respect to the tariff classification of this product, and in view of the further fact that the court is of the opinion that, as a question of fact and as a question of proper construction of the tariff provisions, Ry-Krisp should be classified as bakery goods, the plaintiff must prevail in this action. It might not be amiss, however, to point out that, in addition to the reasons hereinbefore stated, defendant went before the commission to obtain reparation for the same alleged overcharges as it has included in its counterclaim. It voluntarily sought the Interstate Commerce Commission as the tribunal to obtain relief for such alleged overcharges, and the commission, after a full and fair hearing, denied it any relief. Even though the rulings of the commission are not conclusive, at least it should be very persuasive upon this court in determination of the issues presented.

In Standard Oil Co. v. United States, supra, the court stated (page 240 of 283 U. S., 51 S. Ct. 429, 431, 75 L. Ed. 999): "Third. But putting the foregoing grounds entirely aside, and assuming the correctness of appellant's contentions to the contrary, nevertheless, having regard to the remedy invoked and the relief sought by the petition, we think the district court was without jurisdiction. Section 9 of the Interstate Commerce Act, c. 104, 24 Stat. 379, 382 (U. S. C., title 49, § 9 [49 USCA § 9]), provides that a claim for damages against a common carrier may be brought before the Commission by complaint, or by an action in a federal district court of competent jurisdiction, but that the claimant or claimants 'shall not have the right to pursue both of said remedies, and must in each case elect which one of the two methods of procedure herein provided for he or they will adopt.' Having elected to proceed and having proceeded to a determination before the Commission, appellant was, by force of this provision, precluded from seeking reparation upon the same claims by the alternative method of procedure. Compare Geo. A. Hormel & Co. v. Chicago, M. & St. P. Ry. Co. (C. C. A.) 283 F. 915, 918."

The court, upon the evidence and stipulation entered into by and between the parties, adopts the foregoing as its findings of fact, and makes the following conclusions of law:

1. That plaintiff have judgment against the defendant in the sum of $8,868, with interest according to law, and for its costs and disbursements herein.

2. That defendant's counterclaim be and the same hereby is in all things dismissed.

3. Let judgment be entered accordingly.